## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

TERRYE A. SMITH-DAVIS,       )
                              )
       Plaintiff,        )
                              )
vs.                       )    CV-98-RRA-2212-S
                              )
BAPTIST HEALTH SYSTEM, INC.,   )
                              )
       Defendant.     )

**ENTERED**

JAN 3 0 2002

## MEMORANDUM OF OPINION

The plaintiff contends that she was a "qualified individual with a disability" under the Americans With Disabilities Act, that her disability could have been reasonably accommodated but was not, and that she suffered retaliation as a result of asserting her rights under the ADA. The defendant filed a motion for summary judgment, with an accompanying brief. The plaintiff filed a brief in response, to which the defendant filed a reply.   The parties' excellent briefs and the evidentiary references have all been considered.

## DISCRIMINATION CLAIM

Law

The Americans with Disabilities Act forbids employment discrimination against "a qualified individual with a disability." 42 U.S.C. § 12112(a).

*Definition of "disability:"* The Act defines "disability" as a (1) physical or mental impairment, that substantially limits, one or more of the major life activities; or (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(2).[1]

*Definition of "major life activity:"*

> While the ADA defines neither "major life activities" nor "substantially limits," courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") for guidance. See 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA); *Dutcher*, 53 F.3d at 726. The ADA regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations. See 34 C.F.R. § 104. This term is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

*Gordon v. E. L. Hamm & Associates, Inc.*, 100 F. 3d 907, 911 (11th Cir. 1996).

---

[1]In an ADA case, the Eleventh Circuit pointed out that the EEOC defines a physical or mental impairment as follows:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
>> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

> 29 C.F.R. § 1630.2(h)(1)(2).

*Gordon v. E. L. Hamm & Associates, Inc.*, 100 F. 3d 907, 911 (11th Cir. 1996), FN 2.

*"Substantially limits:"* Under 29 C.F.R § 1630.2(j), "substantially limits" means that, compared to the average person in the general population, the impaired person is either unable to perform a major life function or is "significantly restricted as to the condition, manner or duration" under which he can perform the particular major life function.

> [T]he EEOC has provided that courts should consider the following three factors when determining whether an impairment substantially limits a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Dutcher*, 53 F.3d at 726; *Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir.1994), cert. denied, 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

*Gordon*, 100 F.3d at 911.

Courts may consider three additional factors when an individual claims a substantial limitation in the major life activity of work:

> (1) the geographical area to which the individual has reasonable access; (2) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment; and (3) the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical region, from which the individual is also disqualified because of the impairment. 29 C.F.R. § 1630.2(j)(3)(ii); *Ellison*, 85 F.3d at 190. To demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[ ] restrict[ions] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i); *Pritchard*, 92 F.3d at 1133. The regulations specify that the "inability to perform

-3-

a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

*Gordon*, 100 F.3d at 911-12. "'An inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work; rather, 'the impairment must substantially limit employment generally.'" *Weiler v. Household Finance Corporation*, 101 F.3d 519, 524 (7th Cir. 1996). A plaintiff may not be considered substantially limited in a major life activity merely because "out of the universe of hundreds of jobs, she held a very specific job" in which she could not get along with her supervisor. *DeWitt v. Carsten*, 941 F.Supp. 1232,1237 (N.D. Ga. 1996).

It is noted that "working," a general term, is comprised of specific life activities which are necessary to perform particular jobs. For example, the inability to walk, which is a major life activity, would prevent one from performing work which requires walking. Therefore, the specific life activities a plaintiff asserts renders him impaired must affect, for ADA purposes, his ability to work. A plaintiff must provide substantial evidence that his "particular impairment constitutes ... a significant barrier to employment." *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 488 (8th Cir. 1986).

*Definition of "qualified individual with a disability*:" Thus, "a qualified individual with a disability," within the meaning of the Act, is an individual who, though disabled, can, "with or without reasonable accommodation . . . perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. 12111(8).

-4-

*Duty to accommodate*: Once the employer has actual or constructive knowledge of an employee's disability, or considers the employee to be disabled, Congress has imposed the duty of providing reasonable accommodation for workers covered under the ADA, *Gordon*, 100 F.3d at 910.

Reasonable accommodation can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 384 (2d Cir. 1996).

The duty to accommodate, however, does not require actions which would result in undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); *Gordon*, 100 F.3d at 910. Neither does it require creating a new position for the disabled person, bumping another employee to create a spot for him, or eliminating the job's essential functions.  In *Gile v. United Airlines, Inc.*, 95 F.3d 492 (7th Cir. 1996), the plaintiff was unable to work the night shift.  The court stated:

> The ADA may only require an employer to reassign a disabled employee to a position for which the employee is otherwise qualified. *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995). An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to "bump" other employees to create a vacancy so as to be able to reassign the

> disabled employee. *Id.* Nor is an employer obligated to create a "new" position for the disabled employee. *Fedro*, 21 F.3d at 1396. Furthermore, in order for an employer to be obligated to accommodate an employee by reassigning them to a different position, that accommodation must not impose an "undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A).

*Id.* at 499.[2]

In *Wernick*, the plaintiff, who had suffered physical problems, reported that she could return to work, but not to her current position because the stress caused by working with her supervisor would aggravate her back condition. The employer gave the plaintiff the options of (1) resigning from the Fed or (2) returning to her current position, *but under the same supervisor*, with reasonable accommodation for her back problems and continued assistance in locating a position elsewhere in the Fed. The court stated:

> The Fed has steadfastly maintained, and the district court implicitly concluded, that one of the essential functions of Wernick's job was to work under her assigned supervisor, who at the time was Passadin. Nothing in the record leads us to disturb this conclusion. Indeed, nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy. Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons. Contrary to the suggestion by Wernick's counsel in his brief and at oral argument, the Fed did not have an affirmative duty to provide Wernick with a job for which she was qualified; the Fed only had an obligation to treat her in the same manner that it treated other similarly qualified candidates. *See School Bd. v. Arline*, 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 1131 n. 19, 94 L.Ed.2d 307 (1987); *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035-36 (2d Cir.), cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); see also *Daugherty*

---

[2]In *Gile*, the problems the plaintiff experienced while assigned to the night shift, such as daytime insomnia, fatigue, and falling asleep in her car on her way to and from work, progressed and eventually "blossomed" into depression. *Gile*, 95 F.3d at 494.

> *v. City of El Paso*, 56 F.3d 695, 700 (5th Cir.1995) ("[W]e do not
> read the ADA as requiring affirmative action in favor of individuals
> with disabilities, in the sense of requiring that disabled persons be
> given priority in hiring or reassignment over those who are not
> disabled."), cert. denied, 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d
> 211 (1996).

*Id.* at 384-85. "An employer cannot "reasonably accommodate" an employee who refuses

to return to work." *Weiler*, 101 F.3d at 526.

*Prima facie case of discrimination*: In *Gordon v. Hamm*, the employer was aware

of what the employee regarded as a disability — cancer treatment. The employer,

however, denied that the plaintiff was disabled, and asserted that he had been discharged

for work reasons having nothing to do with his cancer treatment. In this context, the

Eleventh Circuit set out the requirements for a prima facie case of ADA discrimination.

The plaintiff must show that (1) he has a disability; (2) he is a qualified individual; and (3)

he was subjected to unlawful discrimination as the result of his disability, and (4) the

employer's actual or constructive knowledge of the disability or considered the plaintiff

to be disabled. *Gordon*, 100 F.3d at 910.[3]

---

[3] The Sixth Circuit tailored the requirements for a prima facie case of ADA discrimination
in cases where the plaintiff has no direct evidence of discrimination and the employer denies
reliance on the plaintiff's disability for its actions:

> If the plaintiff seeks to establish his or her case indirectly, without direct proof of discrimination,
> the plaintiff may establish a prima facie case of discrimination by showing that: 1) he or she is
> disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3)
> suffered an adverse employment decision; 4) the employer knew or had reason to know of the
> plaintiff's disability; and 5) the position remained open while the employer sought other
> applicants or the disabled individual was replaced.

*Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1186-87 (6th Cir. 1996) (footnote omitted).

*A very similar case*:  The defendant cites *Weiler v. Household Finance Corporation* as containing facts and assertions very similar to those in the case before this court, and that court held that the plaintiff was not disabled under the Act:

>    Weiler's position, as stated at oral argument, is that a mental condition caused by an employer's workplace can qualify as a disability under the ADA. Weiler attributes the cause of her "disability" to her former employer; but for her working conditions at HFC, she would not suffer from these ailments. Once she told a representative of HFC that Skorupka was causing her stress and anxiety, she asserts, HFC had a duty to step in and transfer either her or him to alleviate her problems. In fact, Weiler argues she could have returned to work at HFC under a different supervisor. She claims that at the very least a genuine issue of material fact exists as to whether the TMJ disorder, anxiety, and depression substantially limit her work and thus qualify her as "disabled" under the Act.
>
>    Weiler's claim amounts to a charge that she is only unable to work if Skorupka is her boss. Aside from the fact that this contradicts her psychotherapist's testimony, whatever Weiler's problem was with Skorupka, it is not recognized as a disability under the ADA. The major life activity of working is not "substantially limited" if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance. *See, e.g., Palmer v. Circuit Ct. of Cook Cty., Social Service Dep't,* 905 F.Supp. 499, 507 (N.D.Ill.1995) (evidence that plaintiff had a personality conflict with her supervisor which caused her to suffer anxiety and depression not a disability); *Adams v. Alderson,* 723 F.Supp. 1531, 1531-32 (D.D.C.1989) (personality conflict with an "antagonizing supervisor" not a disability under the ADA), aff'd, 1990 WL 45737 (D.C.Cir.1990) (per curiam).
>
>    Moreover, "exclusion from one position of employment does not constitute a substantial limitation of a 'major life activity.' " *Byrne,* 979 F.2d at 565; see also *Forrisi v. Bowen,* 794 F.2d 931, 934-35 (4th Cir.1986) (plaintiff with fear of heights not disabled because condition did not substantially limit plaintiff's work, only his ability to perform particular job); *Duff v. Lobdell-Emery Mfg. Co.,* 926 F.Supp. 799, 806-07 (N.D.Ind.1996) (employer does not regard employee as disabled simply by finding employee incapable of satisfying the singular demands of a particular job); *Howard v. Navistar Int'l Transp. Co.,* 904 F.Supp. 922, 929 (E.D.Wis.1995) (employee did not suffer impairment that substantially limited major life activity, and thus was not disabled, because he could not operate certain piece of machinery). Rather, with respect to the major life activity of working, "substantially limits" must mean significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes. See 29 C.F.R. § 1630.2(j)(3)(i). Weiler claims she can do her job, but not while being supervised by

-8-

Terry Skorupka. If Weiler can do the same job for another supervisor, she can do the job, and does not qualify under the ADA. We conclude that Weiler is not "disabled" as that term is used in the ADA.

*Weiler v. Household Finance Corporation* 101 F.3d 519, 524-25 (7th Cir. 1996).

<u>Facts</u>

The summary judgment evidence discussed and referenced by the plaintiff and the defendant has been considered, and pertinent portions are set out herein.

*Whether the plaintiff was disabled under the ADA*

The plaintiff worked in the defendant's Nursing Administration office. Her problems began in late 1996, when Kelleigh Taylor became her supervisor. According to the plaintiff, Taylor engaged in a "campaign" to get her fired. *Davis Deposition*, p. 55. The plaintiff was subsequently diagnosed as suffering from depression and anxiety.

<u>1. The reason for the campaign</u>: The plaintiff testified that Taylor deliberately set out to conclude the plaintiff's employment with the defendant in order to preserve her own, Taylor's, job:

> Q:   Why do you think you were terminated?
> A.   Oh, God. I can't say why. I think I was terminated based on the fact that my needs for being an employee at Baptist was no longer needed, okay. That I had served my usefulness and that was it.
> Q.   Any other reason why you think you were discharged?
> A.   I guess — I don't know what to tell. The paper trail that had been established during my tenure in the staffing office was what they needed to terminate me with. I don't know. I just can't tell you.

Q.    And that goes back along to this discussion we had about this campaign to get rid of you there at the hospital. If the conference records were the start to this campaign that led to your termination, what was the reason for this campaign that was started against you?

Q.    Other than your belief that Baptist had used up its use for you?

A.    The term Baptist enfolds the whole system, and I'm not saying that.  What I'm saying or what I said at that time about the campaign thing was the fact that my job was just basically needed for somebody else.  Two people couldn't be there.

Q.    And it was you or Kelleigh Taylor, right?

A.    That's my perception.

Q.    So, when those duties were — I don't want to put words in your mouth.  But are you saying that when this '96 reorganization took place, Kelleigh Taylor's duties were eliminated.  And either Kelleigh Taylor had to go or there had to be somebody else found to go to keep Kelleigh Taylor?  Is that kind of –

A.    That once the duties that Kelleigh held before the reorganization were no longer in existence, yes, she had to have another place to go.

Q.    You think that the place that she went was to take over the duties that you had, correct, or a fair amount of them?

A.    That's a pretty fair statement, seeing that that's what happened.

Q.    Then it's your testimony that once she had taken over your duties, as you said earlier, Baptist had used up its use for you or it didn't have a place for you anymore?

A.    Still the inference on Baptist.

Q.    Who is it that you think made that decision, Kelleigh Taylor?

A.    Their need for me then was no longer necessary?

Q.    Yes.

A.    I guess I look at it as a lot of self-preservation, it was hers. So, just like any other human being, she was looking out for herself and her family.  And I'm sure that was the first for her.

Q.    So, you think Kelleigh Taylor is the one who set the chain in motion, once she had been reassigned, to lead to your eventual termination?

-10-

A.   Whether she's the direct or indirect person to do this, I
     can't say. I can say that having lived through it and all the
     things that transpired during that period of time, the word
     you used early, malicious, comes to mind. With regard to
     anybody else's feelings, that was the deed that had to be
     done. My tenure there didn't mean anything. The fact that
     the job I had done there didn't mean anything. That that
     was a great part of my life that didn't mean anything. It
     was just the need that had to be filled was for her. So, in
     order to get me out of the way, hence everything that
     happened.

Q.   Okay. My question is do you think that someone who is
     involved in this reorganization in '96 had the foresight that
     the end result was going to be you being terminated or is it
     --- what you're saying the reorganization was just something
     that happened. And then after the reorganization, that's the
     situation you're stuck with, and then it comes down to it's
     either Kelleigh or me?

A.   That was not my decision.  I mean, that was not how I
     would have thought of it, but that's how it was.

Q.   But you don't think that this reorganization took place in
     '96 in an attempt to get you terminated?

A.   No.

Q.   Okay. I'm just trying to get — I'm trying to figure out who
     is it that you got a bone to pick with here.  Is it Kelleigh
     Taylor?

A.   Mr. Bostick, I don't have a bone to pick with anyone.  My
     whole ordeal that I went through should not have
     happened, the way I see it. But since I'm the victim, I guess
     I feel that way.  And I was a victim in this situation.

*Plaintiff's Deposition*, pp. 346-351.

2. The campaign: The defendant's chronological listing of crucial events is

helpful.  (Marie Garner was Taylor's supervisor).

- Summer, 1996    Taylor becomes plaintiff's supervisor

- June, 1996      Plaintiff begins asking for transfers to other
                  departments

- October, 1996    Plaintiff begins asking to move away from front office position due to "traffic" distractions

- January 6, 1997    Taylor and Garner give Davis two written warnings and one verbal warning for poor job performance

- March 4, 1997    Taylor writes up the plaintiff for tardiness problems

- March 26, 1997    Taylor gave the plaintiff a second written warning and the plaintiff is placed on Probation for three months

- May 26, 1997    Taylor gave the plaintiff a verbal reprimand based on complaint made by supervisory nurse

- June 2, 1997    Taylor and Garner gave the plaintiff a third written warning, plaintiff is placed on a 3-day suspension and her probation is extended

- June 5, 1997    Davis provides first notice to BHS of any alleged disability

- June 9, 1997    Davis submits written request for FMLA leave

- August 11, 1997    Davis Returns from first FMLA leave

- August 29, 1997    Taylor and Garner gave the plaintiff her fourth written warning, the plaintiff was placed on a three-day suspension, and probation was extended

- August 29, 1997    Taylor's payroll reports were improperly shredded

| | | |
|---|---|---|
| ● | September, 9, 1997 | Instead of returning to work at the completion of her 3-day suspension,[4] Davis requests second FMLA leave |
| ● | October 1, 1997 | The vice-president of Human Resources sent letter to the plaintiff notifying her that her employment has been terminated |
| ● | October 15, 1997 | Plaintiff represents to Industrial Relations Board that she is not disabled and her physician represents that she can work in any work environment other than the one she was in at BHS -Princeton |

3. Symptoms and diagnoses: The plaintiff saw Dr. Crenshaw, a general practitioner, on June 5, 1997; Dr. Patton, a psychiatrist, on June 24, 1997; and, on August 17, 1999, after this action was filed, Dr. Shealey, a psychologist.

The plaintiff testified that she experienced symptoms or manifestations of depression and anxiety away from the office as well as at the office. She described the symptoms or problems she was experiencing on June 5, 1997, when she went to see Dr. Crenshaw:

A.  Loss of appetite, crying, could not sleep. If I did, it was just briefly and I would wake up early in the a.m. I had no desire to do anything.
Q.  Have you ever been diagnosed with any kind of sleep disorder?
A.  No, not that I'm aware of.
Q.  Tell me about the loss of appetite. How many times would you eat a day?
A.  Sometimes I would not eat at all during the day or even at night, and then maybe sometimes I would just eat ice cream and nothing else. I just didn't want food.
Q.  Were you dieting at this time?

---

[4] Due to the plaintiff's work schedule, September 9 was the first day the plaintiff was due back following the August 29 three-day suspension.

A.     No.[5]
Q.     Tell about crying.
A.     Any little thing would just set me off and I would just cry.
Q.     Give me some examples of what would set you off.
A.     Watching television, reading a novel, talking to my kids, talking to a friend
       or a relative on the phone, talking to the doctor.
Q.     How about the loss of sleep?
A.     I don't sleep.
Q.     Still to this day?
A.     Still to this day.
Q.     Roughly how many hours would you say you sleep on a given night?
A.     Three, maybe three and a half.  If it's a good night, four.

*Plaintiff's Deposition*, pp. 82-84.  She further testified:

A.     Generally I'm a very family-oriented person.  We generally get together a
       lot and do a lot of things.  I've missed a lot of family gatherings, just not
       wanting to be around people, not wanting to foster off my gloom on their
       happy occasion, so to speak, so I would just stay home.
Q.     Were you during this time on top of working taking care of your
       granddaughter?
A.     Which period of time?
Q.     Roughly '97.
A.     Yes.  Alexis was here in '97.
Q.     And that can be a pretty tiring experience?
A.     It can be.
Q.     Do you thing that that played into your feeling that you — low energy,
       that type thing?
A.     Only grief that she was a child whose mother did not want her.  It had
       nothing to do with any energy level as far as taking care of her.
Q.     Any symptoms other than what we've talked about?
A.     Just the anxiety and just feeling kind of lost.
Q.     You mentioned hyperventilation.
A.     Yes.
Q.     Would that be a symptom that you associated with your circumstances at
       that time?
A.     At this time meaning now?
Q.     No, back in '97.
A.     I had never had any trouble before that with hyperventilation.  So, yes.

---

[5] The plaintiff testified that she lost thirty-five pounds, but also that she regained this
amount and more.

Q.   When was the first time you had trouble with hyperventilation?

A.   If I remember correctly, it started in January, February of '97.

Q.   What brought on your first instance?

A.   Some of the situations at work. Arriving at work and just having to go in the building would just sometimes set it off.

Q.   What do you think it was in January of '97 or whenever this started that changed to make you hyperventilate where you never had before?

A.   Up until that time I enjoyed my job, enjoyed going to work and doing my job. It changed.

Q.   What changed that made you not enjoy your job?

A.   The constant nit-picking and harassment that I was receiving.

Q.   From who?

A.   Kelleigh Taylor, Marie Garner.

Q.   Anybody else?

A.   That's pretty much -- that was the biggest problem.

Q.   Explain to me what would happen in one of these spells where you would hyperventilate.

A.   Well, I would turn into the parking lot, park my car, get out to walk across to the office, get to the office. Sometimes by the time I got to the door I would be sweating or coughing or just rapid breathing. And by the time I put my key in and had to step in there, often times I was half choking to death or just couldn't breathe.

Q.   How many times over the course from when this started until you finished at Baptist would you say that this happened?

A.   Frequently.

Q.   Did you ever hyperventilate when you were away from work?

A.   I haven't. I came the closest to that March the 1st and then again today.

Q.   What happened on March 1st?

A.   My mother was ill and we took her to the Princeton emergency room.

Q.   Other than March 1st with the incident with your mother and today in getting ready for the deposition, have you ever had a hyperventilation episode from the time you left Baptist or were terminated?

A.   No, not that I can remember. And it wasn't the thought of the deposition today. I thought I explained that.

Q.   The thought of people from Baptist being here?

A.   No, not people.

Q.   Then what?

A.   It was just Kelleigh being here.

Q.   Did you ever have any hyperventilation episodes at work other than when you were walking into the building, or would it just be when you initially got to work?

A.    Once after a meeting with Kelleigh and Marie I had that problem, and
      another time was with just Kelleigh during an evaluation.  At that time I
      also had a blinding migraine and I was trying to leave work and she insisted
      that this evaluation had to be done before I could proceed to the doctor,
      and that brought it on.

*Plaintiff's Deposition*, pp. 85-89. The plaintiff testified that her anxiety attacks some times

cause hyperventilation. According to the plaintiff, "Dr. Patton's records document [her]

crying spells, memory problems, problems sleeping, change in weight and appetite, loss

of interest in sex, and anxiety attacks at work." *Plaintiff's Response Brief*, pg. 10. The

plaintiff points out the results of psychological testing performed by Dr. Shealy:

> The test results generally support the clinical impression of an person who has
> been experiencing intense depression and anxiety accompanied by somatic
> manifestations of stress and who continues to experience moderate levels of
> depression and anxiety with some improvement over prior depths of depression.

*Shealey Affidavit*, Attachment 2, pg. 7.  Shealey stated in his summary:

> This psychological assessment provides evidence that Mrs.  Smith-Davis had a
> history in which she as relatively unscathed from childhood traumas either
> psychological or physical and in which she had good and stable parenting.  This
> suggests that her premorbid adjustment (prior to her becoming clinically
> depressed) was relatively good.  It is clear that the major stressor producing the
> depression and anxiety with it was a huge trauma to her.  She has not been able to
> find a way to replace what has been lost and continues to be in grief and
> depression over the loss. While there were other stressful issues such as the
> apartment fire, the custody battle, and the death of the father, none of these
> compare to the loss that accompanied the loss of her job.  She continues to
> experience anxiety whenever she is exposed to stimuli related to the trauma.  For
> example, when she drives by Princeton Hospital she has similar feelings as when
> she drives by Elmwood Cemetery where her father is buried and for whom she
> still grieves.  It is also clear from the history and the medical records that Ms.
> Smith-Davis became depressed while she was still in the employ of Baptist Health
> Systems and that reasonable accommodations could have been made such as
> reassignment to a different area or other supportive measures such as those that
> were recommended by Dr. Patton, here psychiatrist at the time.

*Id*. pp. 8-9.  The plaintiff also testified that she loved her job, that she often gave more than the job required of her, and that at times she had even put her job ahead of family.

*Other jobs*:  The plaintiff testified that there are positions with the defendant she could have performed, as long as she was outside the supervision of Taylor.  She further testified that there are other employers in the Birmingham area where she can work.  She named Mercedes-Benz, as a "team member;" as customer service representative for BellSouth Mobility and Blue Cross-Blue Shield; Kelly Services as a general office worker; at ACIPCO as a computer operator; and as a child-care provider at Child Care Resources. The plaintiff further testified that her doctor stated on her medical release form that she could work "as long as it was not a similar situation from the one that [the plaintiff] was in at Baptist."  *Plaintiff's Deposition*, pg. 78.  The plaintiff registered for work at the unemployment office.  As to her stating on her unemployment compensation form that she was not disabled, the plaintiff asserts that her mental problems wax and wane. When asked if there was a particular reason she had not applied for other jobs over the last year and a half, the plaintiff stated that she was "frustrated" that she had not gotten a response from any of the employment applications she had submitted.

*What Taylor knew*: The plaintiff testified that she hyperventilated in Taylor's presence at work.  In her brief, the plaintiff states that "Taylor witnessed [the plaintiff's] anxiety attack and uncontrollable crying in the workplace. She knew about [the

plaintiff's] difficulties in her personal life and she knew that [the plaintiff] sought medical

treatment for her symptoms of anxiety and depression." *Plaintiff's Response Brief*, pg. 20.

*Accommodations*:    The  defendant  sets  out  the  changes  in  her  employment

conditions desired by the plaintiff:

> Davis testified that in late 1996 (very soon after Taylor became her
> supervisor) her "position had become very stressful," (Plaintiff's Deposition, at
> 212), and that interruptions often prevented her from completing her primary
> tasks. In her deposition, she testified:

>> I was stationed at the front desk of the main office for nursing
>> service where all the traffic entered, constant interruptions,
>> constant phone interruptions. I often had to stop work that I was
>> doing, my primary job, to do something else for somebody else. It
>> was a dual receptionist, secretary, staffing, scheduling, payroll
>> position.

>> If memory serves me right, I was assigned that area after Shirley
>> Honeycutt, who was the original secretary there, retired. And if I
>> am half way accurate on that, she retired October of '96. That was
>> when I was put out there. I brought this to their attention several
>> times from that point up until the time of my termination.

(Plaintiff's Deposition, at 128). Davis felt that she should have been allowed to
switch places with a co-worker, who was a secretary, because the desk she was
working at had previously been staffed by a secretary or receptionist. (*Id.*, at 190).
Davis felt that her location in the office "did not allow [her] to give [her] duties
undivided attention." (*Id.*, at 129). She felt that a move to another location in the
office would provide "[l]ess interruption, less stress of trying to do and juggle all
those positions at once." (*Id.*, at 129). Taylor testified that once Davis complained
about the desk situation, Davis was allowed to rotate work shifts at the desk with
other employees. (Taylor Deposition, at 214). Davis admits that in response to
her request to limit the interruptions, others in the office were assigned
responsibility for answering the telephone on payroll days. (Plaintiff's Deposition,
at 187).
     Davis says that a few months after she started working under Taylor's
supervision she began to request transfers to other areas outside Taylor's
supervision because "[i]t had become apparent that I could not do anything right
or to the satisfaction of... my supervisors." (*Id.*, at 213). Davis testified that she

would have had no problem performing in other positions away from Taylor "[b]ecause [she] had other supervisors before Kelleigh, and [she] hadn't had those problems." (*Id.*, at 238).

*Defendant's Brief*, pp. 3-4.

Discussion

*Whether the plaintiff is disabled under the ADA*: In its brief, the defendant states that the only major life activity it perceives the plaintiff is asserting is that of working. In her response brief, however, the plaintiff does not argue impairment of the major life activity of working. She asserts, though, that her disability "potentially effected the most important life activity of anyone, living." *Plaintiff's Brief*, pg. 17. The plaintiff states that her illness "severely limited" her daily activities such as sleeping, eating, concentrating, and interacting with others," *id.* at 15, and that on her leave of absence request form "Dr. Patton clearly indicated 'depression,' 'crying,' 'poor sleep,' and 'unable to cope,' as the medical facts that support her certification." *Id.* at 11. "Accordingly [the plaintiff argues], sufficient evidence is before this Court upon which a jury could reasonably conclude that Ms. Davis' illness substantially limited one or more of her major life activities including, but not limited to, sleeping, eating, concentrating, and interacting with others. *Plaintiff's Brief*, pp. 17-18.

Whatever impairment is asserted by the plaintiff, the law previously cited is clear that one who cannot work under a particular supervisor is not a "qualified individual with

-19-

a disability." Problems originating in the workplace can affect other aspects of life. Although this plaintiff experienced symptoms of depression and anxiety away from the workplace, her problems originated at work and "blossomed" into depression and anxiety. *Gile*, 95 F.3d at 494. The plaintiff testified to her dedication to her job, stating that at times she even put the defendant's interests ahead of her family. She became despondent when, after years of dedicated service, her performance suddenly was being criticized, and she began to doubt herself.

It is clear that the plaintiff's mental/emotional problems center around the person of Kelleigh Taylor. Even though the plaintiff's psychologist stated that the plaintiff continues to suffer from anxiety, she attributed the plaintiff's problems to her employment with the defendant, which means Taylor. The plaintiff even testified that her only episode of hyperventilation since leaving the defendant's employ occurred when she appeared for her deposition in this case; the plaintiff attributed this episode to Taylor's presence. The accommodations the plaintiff wanted were changes that would reduce the number of opportunities for Taylor to criticize her; in other words, to get out from under Taylor's thumb. It was working under Taylor — with her constant "nit-picking and harassment" — that caused the plaintiff's depression and anxiety. Additionally, the plaintiff testified that she is able to perform numerous other jobs.

It is concluded that the evidence cannot support a finding that this plaintiff is a "qualified individual with a disability." The plaintiff's claim of discrimination is foreclosed in the main by her own testimony as to the source of her depression and anxiety, and her testimony as to her ability to perform other jobs. She simply cannot overcome the law that one who cannot work under a paticular supervisor or perform a particular job is not disabled. Moreover, even if the plaintiff could be considered a "qualified individual with a disability," she has not produced evidence indicating that the defendant's stated reasons for dismissing the plaintiff are pretextual. Indeed, the plaintiff herself gave a non-discriminatory reason for Taylor's actions: Taylor deliberately sacrificed the plaintiff in order to keep her own job. If it is contended that the plaintiff cannot speak for Taylor's motives, there is nonetheless insufficient evidence of pretext to allow this claim to proceed. Taylor's actions concerning the plaintiff *after* the plaintiff developed clinical depression and anxiety were the same in nature as they were *before* the plaintiff became depressed and anxious.

*Whether the defendant regarded the plaintiff as having a substantially limiting disability*: The plaintiff now asserts that she was not disabled, but the defendant wrongly regarded her as disabled and discharged her for that reason.

Because society's myths or fears concerning mental illness can be as handicapping as the real limitations that flow from actual impairment, discrimination based solely on a perception of impairment is forbidden under the ADA. As evidence that she was

regarded as being substantially limited in one or more activity, the plaintiff states that she

"suffered ridicule from her co-workers because of her disability." *Plaintiff's Response Brief*,

pg. 20. The plaintiff testified that certain comments by her co-workers were expressions

of concern. She also testified to some comments she did not like:

> Q.   Did any of those people make any comments to you about how they perceived your condition?
>
> A.   Some were relatively nice and said they were glad to see me back, hope I did well.
>
> Q.   Did any make any derogatory comments?
>
> A.   About the Prozac, yes.
>
> Q.   Who said what?
>
> A.   I'm trying to think. It was in the afternoon. I don't remember the date, but we were sitting there talking. And I never really actually acknowledged the use of Prozac to these two people, but I guess it was a given that I was taking it. I know I made Kelleigh aware of it and I know Susie Bowden was aware of it. But other than — telling anybody else that I was taking Prozac, I minimized that knowledge. In this conversation — and I think it was with both Wendy and Amanda — I considered it a negative thing because they said, "You know, some people that take Prozac flip out. And on of the guys that shot up McDonald's a while back, he was on Prozac." So, I didn't receive that very well.
>
> Q.   Has anybody ever made any comments directed at you in a derogatory way that they thought less of you because you were on medication?
>
> A.   Sometimes they called them crazy pills.
>
> Q.   But did anybody make any comments directed at you?
>
> A.   That was directed to me.
>
> Q.   Do you remember any other comments?
>
> A.   I can't at this time.

*Plaintiff's Deposition*, pp. 36-38. She further testified that people "jokingly" asked if she

had lost weight because of her medication or because she was on a diet or was it caused

from worrying. *Id.* at 340. The plaintiff points out that she had a telephone conversation

with Taylor on June 5, 1997, informing Taylor that Dr. Crenshaw was taking her off

work for a few weeks because she was having some psychological problems as the result of some "things that had been going on." *Id.* at 95.

There is insufficient evidence to support a claim that the defendant regarded the plaintiff as disabled. Many, if not most, of the comments made to the plaintiff upon her return from leave were expressions of concern. Other comments, which the plaintiff contends were offensive and inappropriate, might have been made jokingly. In any event, these statements were not made by Taylor or anyone in a position of authority over the plaintiff or anyone involved in the decision to terminate the plaintiff's employment Moreover, the claim that the defendant regarded the plaintiff as disabled is exactly what the plaintiff contends: that she *was* disabled.

## RETALIATION CLAIM

A plaintiff establishes a prima facie case of retaliation by showing that (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) the adverse action was causally related to the protected expression. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1325 (11th Cir. 1997).

On August 29, 1997, the plaintiff was given a three-day suspension. Due to her work schedule, that meant that the plaintiff was due to report back to work on September 9, 1997. Instead of returning to work on September 9, 1997, however, the plaintiff requested a second FMLA leave. On October 1, 1997, the defendant's Vice-President of

-23-

Human Resources, Mark Kernan, sent a letter to the plaintiff terminating her employment. The plaintiff points out that she was not fired when she was put on her three-day suspension, that she could not have done anything wrong while she was on suspension and away from the workplace, and, therefore, it follows that she was discharged for having exercised her rights under the FMLA.

In response, the defendant states that the plaintiff's employment was terminated because of her uncorrected performance problems and the August 29th payroll shredding incident. The termination letter sent by Kernan stated in pertinent part:

> A review of your last disciplinary action, suspension and probation on August 29, 1997, regarding your job performance has been completed. . . Due to the fact that you, Terrye, are presently on probation for similar performance issues and because of discovery of missing payroll records in the shredder, you are terminated. . . .

The plaintiff acknowledges that shredding payroll records might be a legitimate reason for termination (*Plaintiff's Response Brief*, pg. 39), but she contends that the defendant had no proof that it was she who had shredded the records, the defendant did not investigate the incident, and the defendant did not even ask her if she were responsible. The plaintiff has now testified under oath that she did not shred those documents.

Taylor and Garner both testified that the plaintiff's payroll materials were found in the shredder with Taylor's work, that a nurse manager informed Taylor that the plaintiff had accessed Taylor's payroll folder the night before, and that the only other employee who worked the night of August 28 denied shredding the documents and stated

-24-

that she saw the plaintiff in the room with the shredder. Even though it might have been better if the defendant had questioned the plaintiff about the incident, an investigation was conducted, and it cannot be said that the decision that the plaintiff had done the shredding was arbitrary or arrived at in bad faith.

Concerning the sequence of events which the plaintiff contends constitutes sufficient evidence of a "causal link," the three-day suspension and the shredding incident occurred on the same day, August 29. Clearly, investigating the shredding incident and "completing" the evaluation of the plaintiff's job performance occurred some time after August 29, which accounts for the fact that the plaintiff was not dismissed on August 29.[6]

If, after engaging in protected action, an employee is discharged for misconduct of the same type as that for which he was previously warned, he has not made out a prima facie case of retaliatory discharged. In *Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997), it was held that there was not a causal relationship between the filing of a charge of discrimination and the plaintiff's subsequent discharge for poor work attendance, when she had been warned about poor attendance before she filed her discrimination charge. The court stated:

> Hilti issued oral and written warnings about the consequences of poor attendance both before and after August 3, 1994, when she filed the charge of discrimination.

---

[6]Whenever the dismissal decision was actually made, the plaintiff, while out on her second leave, was notified of her termination by letter dated October 1.  Taylor testified to the timing of that letter: "[The plaintiff] had completed her twelve weeks FMLA. She wasn't eligible for any more. So then at that point, she was terminated." *Taylor Deposition*, pg.  245.

> The additional warnings followed by discharge on January 16, 1995, simply completed the disciplinary process already set in motion.

*Id.* at 1324. The defendant asserts that, "[a]s in *Hilti*, [the plaintiff's] performance declined and the level of BHS' discipline progressed to the brink of termination before she requested FMLA leave." *Defendant's Brief*, pg. 23.[7]

It is concluded that the plaintiff has not established a prima facie case of retaliatory discharge.


## CONCLUSION

It might be that the plaintiff was treated unfairly by her supervisor. It might be that the termination, which occurred when Taylor was made the plaintiff's supervisor, was likewise unfair. Mere unfairness, however, cannot support a charge of discrimination or an ADA claim. Wherefore, the defendant's motion for summary judgment is due to be granted and the complaint dismissed. An appropriate order will be entered.

DONE this 30th day of January, 2002.


Robert R. Armstrong, Jr.
United States Magistrate Judge

---

[7]Again, the plaintiff herself thinks that she was terminated as result of Taylor's efforts to get rid of her.

-26-